Judge Clifton, Judge Raulston, Judge Marshall, if it pleases the Court, my name is Ron Van Wert. I'm here on behalf of Appellant Keith Peer. Your Honor, Mr. Peer brings six issues before this Court. In order to effectively touch on each issue as best as I can, I will try to do them in a chronological order as they arose during the proceedings. I will attempt also to limit my arguments at this time to 14 minutes, so I can reserve six minutes for rebuttal. I would just express my concern is more if there were multiple conspiracies, what your position may be on that, and the sufficiency of the evidence argument that you raise. And I know you're going to get to that, but I just wanted to suggest that that was of concern. Your Honor, if that is the concern of the Court as a whole and would like me to shift directly to that, I very well will. I don't have to go in the order that I chose by any means. It's up to you. Well, since Judge Marshall requested that aspect of it, I will turn directly to that. In regards to what is referred to in the brief as constructive amendment and a fatal variance, what has occurred in this case, Your Honors, is the government streamed together many conspiracies with only one nexus, that being Mr. Omar Vizorado-Sedano. In your view, how many conspiracies were there? Your Honor, there's at least two distinct conspiracies. I said many. The multiple conspiracies exist because when I say two distinct conspiracies, the way the trial was structured by the government was a discussion mainly about an individual by the name of Christopher Awbery and then the individuals under Omar Vizorado-Sedano, which really branched out. There was a Michelle Mitchell aspect on the one side. On the other side, Mr. Awbery. And then a number of individuals under Mr. Awbery that he distributed drugs to. So there was that Awbery organization and conspiracy. And then there was arguably the conspiracy between Mr. Awbery and Mr. Vizorado-Sedano, and then the conspiracies on the other side involving Ms. Mitchell. I think that what gives the court the best vision of this is ER-250. It's the chart that was entered into exhibit by the government. It's the government exhibit 182, and that's an ER-250. The court will see by that a structure that was actually developed and created by the government, which shows the various splitting apart from this one individual nexus, that stringing together many people into this overall so-called conspiracy, when in fact there was separate facts introduced as to each. If we assume that there was more than one conspiracy, what's counsel's position, Ray, prejudice and variance? The prejudice and variance, Your Honor, is in the respect that there was a transference of guilt with spillover of the evidence. In other words, we spent the first more than half of the trial talking about Christopher Awbery. Mr. Awbery was found with an extreme amount of drugs, guns, bulletproof vests, ammunition, and then a discussion about everybody underneath him without any facts relating to my client, Mr. Peer, and that conspiracy, if you will. So that's the spillover that you think caused the prejudice? That's exactly right, Your Honor. The judge gave an instruction to the jury. The jury seemingly compartmentalized the evidence because they came up with different quantities for various defendants. What do you say? To that, Your Honor, I believe that the confusion of the jury is actually evident in its verdict, and not only the differences of the amounts, but there was a jury question asking the question to the court regarding the confusion in the instructions between the individual amounts and then the amounts, if there's a conspiracy found, if it was an overall conspiracy, if there truly was that proved to the jury, the jury, by way of the evidence, would have to find each of the individuals guilty for the same amount because each one would be responsible for the distribution of the other. The multiple conspiracy instruction, Your Honor, is one in which they say if you do find that there are multiple conspiracies, that it wasn't, and that wasn't what was alleged in the indictment. There was an overall conspiracy. So the multiple conspiracy instruction says if you have multiple conspiracies, you must acquit.  That's not necessarily inconsistent to have different amounts for different people, because there's a reasonable, foreseeable component that's in there in terms of the amount of the drugs, isn't there?    There is, Your Honor, that part of the instruction which talks about the reasonable determination. However, if we go back to the trial in this case and the way the court put it, the government put it on, they alleged that all the distribution was known throughout the conspiracy, that they had reasonable knowledge of these individuals, that the amount of the cocaine that Mr. Aubrey was distributing was an extreme amount, and ultimately to find that they did not each have at least reasonable knowledge of this really shows that they saw this compartmentalized. They saw it as different conspiracies and different individuals doing different things, not this overall conspiracy that was alleged in the indictment and was the issue before the court. Counsel did not object to consolidating these cases for trial, apparently. As I understand it, the judge addressed it orally, then gave counsel an opportunity to submit something in writing the next day or within a few days, raising any objections to the consolidation for a trial, and I think counsel didn't file anything. Your Honor, the understanding before Chief Judge Van Sickle, if I recall correctly and I don't have my finger on the transcript, is that the one motion of one defendant covered all defendants unless you opt out, not opt in. If I recall correctly, we appeared before Chief Judge Van Sickle regarding how the trial was going to proceed. It was early in the month of August, if I remember correctly, and he said, well, I'm going to put all these together, and there were motions to bifurcate before the court that I believe were denied. To bifurcate? To sever. Maybe I misspoke, Your Honor. To sever the trial, not to consolidate. There were numerous motions before the court. I don't recall seeing that in the record. I'm not convinced that that's the case, so counsel may be right, and I don't want you to take time trying to find it now. Your Honor, I am basing that upon my memory of the situation. I do recall some motions to sever the trial. I apologize if ---- Well, perhaps when you're waiting for your rebuttal time, you can use that to find points to the record. I will attempt to do that, Your Honor. You know, I think that ---- That's not an issue you're pursuing on appeal. I'm sorry? Is that a failure to grant a motion to sever doesn't appear to be an issue you pursue on appeal separate from the single multiple conspiracy. That's correct, Your Honor. It's not part of the indictment. The point was, though, that if there was so much prejudice in terms of the spillover, it would have been logical to seek a severance if that was the view of defense counsel, that there was going to be so much spillover evidence. I think that's why. I think that's why Marshall was asking that question. Your Honor, and I understand that. In fact, that was a concern of counsel at the time of the trial, and that was put before the court in way of a motion stating that the indictment was duplicitous. And we brought it before the court that it was duplicitous and that what they were really doing was alleging a number of conspiracies, including cocaine. We point out the fact that the Aubrey organization was separate. The court denied that motion. So it was in the form of a motion of the indictment being duplicitous rather than a motion to sever from this counsel, Your Honor. Your Honor, in that same vein, I'll get back to that. If the court has any more questions on that issue, I'd be happy to answer them, or I'll turn to the motion to suppress and the knock-and-announce issue. That's before the court. And the motion to suppress was filed and denied by the district court. It came down to the knock-and-announce and knock-and-announce rule. As this Court is familiar, the knock-and-announce rule provides that the officers and agencies are to knock and announce their presence, and then they may enter forcefully if there is a refusal to answer. That refusal can be, by the way, of silence. However ñ It's clear it was the exigent circumstances, it appears, that the court relied on. Your Honor, there was really no exigent circumstances. Any exigency was created by the agent. The corroborated evidence in this case showed that young Mr. Mitchell was seen in the window as they approached the house. Mr. Mitchell testified that he was told to get down on the ground right when he was seen, in the window. This was also heard, get down on the ground, by the exact officer who was conducting the knock-and-announce. That's really the only corroborated evidence of what was heard. The police officer said he heard it. The individual said he heard it. Now, if you knock and announce, and the individual shows within a few seconds, you tell them to get down on the ground, you make it impossible for them to answer the door. You create the silence that you are now relying on to forcefully enter. So that presupposes that there is only one person in the house, and they knew that there was more than one person in the house. Well, Your Honor, not only do they know there was more than one person in the house, they're aware of the structure of this house, the time in the morning, and the detective who wrote the report also was a hairstyle client of Ms. Mitchell, who was a hairdresser, who conducted her business inside that home. So they are familiar with it. I don't get your point that somebody should – that that doesn't mean somebody – that it was impossible for someone to answer the door just because they told one person to get down. Well, Your Honor, that was the person they knew of and could have answered the door, and they told them not to answer the door. That's what they based their compromise on. They said they entered this house because they had been compromised, which they equated with the loss of surprise. Well, if you're knocking and announcing, your purpose isn't to lose – you don't compromise. Well, let me say it this way. If you're worried about the loss of surprise right when you knock and announce, that would be the compromise. You can go in because you lose the aspect of surprise at that point. But nevertheless, that's what they relied on in their testimony is the reason they call it compromise. Now, this so-called exigent circumstances, the compromise did not appear in any report regarding this raid. It didn't come up until the motion to suppress, and they testified to it at that point. What's your bottom line, counsel, on this argument? What's your bottom line? Is that they should have waited longer to go in? They shouldn't have made a forcible entry? What's your argument? The bottom line, Your Honor, is that they should not have forcibly entered until they had the opportunity – gave somebody the opportunity to answer, but they created the exigent circumstance that they now claim was the reason they forcibly entered without allowing enough time. Well, there's a factual finding that 15 to 20 seconds elapsed. You're attacking that. Does the fact that the son popped his head out the window, is that just a sideshow? Isn't it enough for them to wait 15 to 20 seconds under the Supreme Court's case law? Your Honor, the time in which they ordered the person to get down on the ground was within the first five seconds. They said that they saw or heard something in the window as they walked up to the door. When they knocked and announced, almost simultaneously after that, they heard the report, get down on the ground. That was almost instantaneous with the whole action, a very short period of time. They then told them to get down on the ground, which prevents, again, silences them from being able to answer the door, creates the exigency and the compromise that they claim to go in the door. So really, the whole 15 to 20 seconds is the sideshow. It's not really the issue here because what they did is they prevented it from ever happening right off the bat. They never gave them the opportunity. They were deliberate and they're deliberate. The problem I have with that argument is that might be true if he were the only one in the house, but he wasn't. Well, Your Honor, they came at 7 o'clock in the morning. The individual in the window was the first one they saw. Whether or not there are other ones in the house, the basis for what their claim is the exigency and the compromise is not the other people in the house. They claimed it because they stated this individual didn't follow their commands when, in fact, he did. He got down on the ground. They don't need to claim exigent circumstances because 15 to 20 seconds is enough, according to the Supreme Court. And we've got a factual finding that says that's how long they waited. Well, they did claim exigent circumstances, Your Honor, but not only did they – but the problem is, is the time that they – I disagree with the timing. I want to make that clear. Nevertheless, they created the time. They created any delay by their own actions. It doesn't matter if they created it. The question is whether or not sufficient time elapsed for them to make a forcible entry. That's the question that the district court was faced with and that we are reviewing. I respectfully disagree with you, Your Honor. I do think it matters whether or not they created it. The question is, were they deliberate and did they delay? And by deliberately not allowing somebody to answer the door, by silencing them, by telling them to get down, not allowing them to answer the door, that is the problem. The knock-on-announce is not for the government to take advantage of. It's to protect privacy interests, to protect security interests. Knock-on-announce is to give the occupants of the home, occupants, anyone who's there, the opportunity to voluntarily open the door. So if there's someone else there, the fact that you told one person to get down does not negate the effect of the knock-on-announce for the other people who are there. Your Honor, I understand your argument, however. I'm not arguing. I understand your position. I apologize. But the ---- Sometimes the positions are rhetorical. I mean, the government will have a crack at it, too. But there is a puzzle here. Now, I can see there's a puzzle the government's going to have to deal with, because if you tell somebody, in effect, not to answer the door, well, how are they supposed to answer the door? And yet, in this case, we've got a passage of time and a factual finding by the district court, which you have to challenge based on a clear air standard, which is tough to do. So ---- Well, Your Honor, the court looks at the knock-on-announce in de novo, but the clear air is based on the evidence. The court ignored, really, the evidence regarding the cooperation that the officer knocked and announced, heard get down on the ground, the individual heard get down on the ground. That was the first command. Again, it silences that individual. Although there's other individuals in the house, they still ---- this individual coming up, this individual supposedly not following their directions is the whole reason they give for their call of compromise and the reason they bashed in the door. They don't get ---- Was this a two-story house? Yes, Your Honor. And so they saw someone upstairs, right? That's correct. In the window, directly looking over them, going in, no shirt on, young man, at 7 a.m. in the morning. I do want to reserve some time for rebuttal. There are other issues before the court. They don't seem to be as pressing in this court's questioning. However, I will stay ---- well, I'll leave it at that and just reserve the rest of my time. All right. Thank you, counsel. If it pleases the Court, my name is Earl Hicks and I'm representing the United States on this matter. Your Honor, there are obviously two issues that the Court is concerned about, those two issues being the single versus multiple conspiracy and also the knock-and-announce. Now, generally what I hear last is what I respond to first, unless the Court wants to change that order. First of all, on the knock-and-announce issue, some of the factual findings by the Court, first of all, I think the District Court considered all of the facts. The District Court had to make determinations of credibility. The District Court had to determine what was reasonable in light of what the officers knew at that time. And at that particular time, the District Court did not find that the officer told the young Mr. Mitchell to get down. Well, he found what the Court found was police officers, stay where you are. Correct. Not get down. But of course, counsel's argument is, and you heard the argument, if that's what was told, then the person, of course, couldn't answer the door. So it brings us back, I think, to the same argument. I think that we look at the reasonableness, though, of what the officers knew at that time. First of all, if the person comes to the window, obviously people have heard or somebody has heard the knock. Somebody has heard the knock. If somebody shows up at the window and as the young man knocked on the door, he could have just been looking out and saw them. He indicated in the record, and I don't know exactly where, Your Honor, and I apologize for that. Some of these records are lengthy. He indicated in the record that he looked out because he felt the vibration, saw police officers, knew they were police officers, he believed, because they had guns. All right. There was normally, and I think that you can take into account normally, a person would say, normally if you look out your window or other people look out their window and they see law enforcement officers or they see that somebody is at the house, they'll make a comment like, coming, or I'll be there. That's absent because it didn't happen. What happened, according to the officer, was, is that the individual retreated, went away from the window after he instructed him to stay there. Now, But then the question is, if he instructed the individual who was cited to stay where he was, then how can he be expected to answer the door? Well, I understand that question. What's your response? My response is, is when did that take place? After there had already been a knock and announce, which obviously had in some way been acknowledged by this young man that he had either felt the vibrations or heard something, a reasonable officer would believe then that somebody is looking out upon them, realizes that they are there. The person doesn't say coming, doesn't say anything. He tells them to stay there. At that particular point in time, it's a reasonable thing to stay there because what the officers testified to is that there was no response in effect. And what happened is that they felt that the circumstances had been breached, not just because the secrecy of the search, but because somebody had done something contrary, in effect, to a command. And so what happened is that they felt that they then had to react. Again, the government's position is also, and I'm talking about the exigency, the government's position is that 15 to 20 seconds was a reasonable amount of time. Now, in addition to that, the officers did not, there was only one officer who saw that. It wasn't all the officers. And this officer was stationed behind. So he saw that. He then related on that he felt that there was a breach. The officers then up front then knocked and announced again. Now, again, the estimates of time are just that because we don't have officers looking at their watches to pay attention to that because they have to pay attention to more serious things. It was only after a second knock and announce that they then went in. And there was nobody that had come to the door, nobody that had attempted to come to the door. And, of course, we have the one individual who's told to stay where he was. So it creates a difficult circumstance. But I think that if you look at what the officers knew at that time, and as the judge indicated, there was the possibility of firearms there. And we're not looking at this in isolation because the case law tells us that that alone is not an exigency. But you also had methamphetamine. You had 15 to 20 seconds, which had expired. You had an individual who had come to the window, and then that individual had disappeared from the window, whether he had gotten down or what the circumstances are. And then, as the court indicated, that there was confusion at some point because as the officers then entered, they said, get down, get down. And through the testimony of the young man, Mr. Mitchell, he maintained his testimony that what they told him to do was to get down. But he also indicated that he was confused. The judge had the right to make a credibility determination. And, of course, you can review that for clear error, but when you have conflicting testimony, that's what a judge is supposed to do. They're supposed to decide based upon what they feel is in their mind most appropriate. So the government's position is that there was no exigency which was created by the agents. They have to protect property. They have to preserve evidence. And they have to be concerned about the safety of their fellow officers all at once. And they have to make some rather quick decisions. So the government's position is that they did what was reasonable. They let the necessary and appropriate amount of time go by before they breached. If the court wants me to move on, we go to the single versus multiple conspiracy issue. What is the government's position? Are you still contending that this was a single conspiracy? Yes, we are, Your Honor. And, Your Honor. Is there any evidence that you can provide of the chart that you've given us and the evidence and everything else that appears in the record? Unfortunately, I didn't look back at the chart. And I apologize for that, Your Honor. I did not look back at the chart this morning. One might conclude that it was the most convincing thing that you gave us, that it was a multiple conspiracy, not a single conspiracy. If we look at the facts as they were presented. What was the link between, I mean, if one looks at the chart, because I understand you don't have the chart, if you assume that there were at least three different groups involved in the distribution of the meth, what was the connection between the three? The primary connection was Ms. Breanne Ruff. The primary connection between Ms. Breanne Ruff is that it was Ms. Breanne Ruff who first became involved in the distribution of methamphetamine in Coeur d'Alene, Idaho. And I'm relating this to the pier, Coeur d'Alene, Spokane, because it really relates to Coeur d'Alene, Idaho, and Spokane, Washington, which are 35 miles apart, what's taking place during that period of time, and who are the primary players and what's taking place. And the facts are is that Breanne Ruff was purchasing methamphetamine from Omar Lizarra of Sedano. Mr. Sedano was selling her multiple ounce quantities of methamphetamine, which she was distributing directly to Mitchell, and to which she testified that Mr. Peer would assist by breaking it up for redistribution, putting it on the scale for redistribution. During this period of time, both Mitchell and Ruff would travel to Spokane, Washington, in order to re-up their supply, in order to, on some occasions, Mr. Sedano and his associates would come to Spokane, excuse me, come to Coeur d'Alene and deliver. There's a falling out between Ms. Ruff during this period of time. Ms. Mitchell has met Mr. Omar Lizarra of Sedano. He continues to provide her then, all the way up until the time of this search warrant, large quantities of methamphetamine, and those large quantities being sometimes one pound every other day. At the same time that this is transpiring, Ms. Ruff is working with another person who is going directly to Omar Lizarra of Sedano. That other person is Mr. Christopher Awberry. Now, at the same time, it's the same time framework, it's the same goal, you have some of the same players. It's not necessary that we have all of the same players, because if we were to have ñ it's not unusual for their two co-conspirators not to know who they're dealing with. And their overall ñ Do we have evidence in this case that they did know? Some of the people knew who they were dealing with. If there was more than one conspiracy, what's the government's argument as to how the jury's decision should be upheld? Well, the government's position is that the jury's verdict should be upheld. There was no prejudice to the defendant during the case. Counsel suggests the spillover, and then that gets us to the fact that they were all tried together. And maybe you can comment on that issue about the consolidations. No. The spillover effect is an effect where you are introducing overwhelming evidence, against somebody who shouldn't really be there. And I think that there's a difference in the type of evidence, for example. Somebody would be a much smaller distributor. For example, you would have ñ in this case, we have pound distributors. Both of them are pound, multiple pound distributors, the people that are involved. And I'm talking about not the ones that went to trial, but the overall structure of what was going on, is that they were dealing with pound distributors. Because if you look at those who went to trial, four went to trial, is it four? Yes. Okay. If we look at those who went to trial, counsel would argue that the prejudice was the spillover as to those who went to trial. One of the ñ excuse me, Your Honor, I didn't mean to cut you off. No. Okay. One of the individuals who, of course, went to trial was Mr. Serrano. And most certainly the testimony as to his involvement with Mitchell & Pierre would have come in. It would have come in no matter what. And that was a portion of the trial. The other individuals, Mr. Gross, he was arrested in Post Falls, Idaho. It showed a connection that these people actually did traverse the border, go back and forth, that potentially that evidence would have been there. Mr. Breitop is a lower level player. Mr. Breitop was somebody that the jury found that he didn't have the same level of involvement. And ñ Counsel suggests the fact that the jury found different quantities indicates that they believe that there were multiple conspiracies, but seemingly found that there was only a single conspiracy just based upon the jury instruction given. I think that if you ñ excuse me. If we go back ñ I'm sorry that I'm so quick-triggered, Your Honor, because it's just that my ñ sometimes I speak faster than I think, and I apologize. But thinking that through, what happened is we had a Blake to Blakely decision that came out. And basically the instruction that dealt with the amounts was a sentencing instruction. And the structure of the then believed to be mandatory guidelines at that point in time was that ñ and if you look at the structure of that instruction, was that it's what was reasonably foreseeable. Because it is not the case that just because you're a member of the conspiracy that you're responsible for all of the drugs that are involved. And I think that was a sharp and shrewd ñ a very sharp jury that looked at that and said, wait a minute, this is what the government's proven as to Mr. Breitopp. They've only proven that he was involved in the conspiracy, because remember that there was an instruction that says if it's a multiple ñ if he's not guilty of the same conspiracy that's charged, or if you believe there's different conspiracies, then you have to find him not guilty. But the ñ That's the instruction that I was referring to. That was a proper instruction to be given. That's not a sentencing instruction. Right. But the instruction ñ but there was a sentencing instruction. And I'm not remembering which one it specifically is. But the sentencing instruction went to the issues of amounts. And that's what the jury found. And that was because of the Blakely decision that the judge gave a sentencing instruction. So, for example, Mr. Gross was found a different amount. And I don't have an issue there, but let me ask you this question. What do you recall about the consolidation of the cases, that is, all the defendants being tried together? Defense counsel seems to recall that there was some objection to that. There were a couple of times where for personal reasons ñ I tried the case, but there were a couple of times for personal reasons that I was not present at court. And I do not believe that they moved to sever these counts. I do believe that they did have a concern that there were multiple versus single conspiracies involved. It was an issue that I know between counsel was discussed. And I'm not trying to avoid the question. I'm just trying to tell the court that when you asked that, I sat there and said to myself, and I tried to recall it, and I cannot. And I apologize to the court for that. But the government's position is that it was a single conspiracy, that the overall purpose of the conspiracy was to distribute multiple quantities of methamphetamine, and that the evidence support that there's more than one link, more than just Omar And as I understand your position, even if there were multiple conspiracies, you find no prejudice. Correct. I have nothing further, and thank the Court for that. Your time. Thank you, counsel. Rebuttal. Thank you, Your Honor. I would like to go back shortly to the not-going-to-announce issue in relation to what exactly was heard and the proposition that Mr. Mitchell is confused about what he heard. I do like to repeat to the Court that there is testimony from Mr. Shansky, Officer Shansky, who did the not-going-to-announce, that he heard exactly those words, please get down. You can find that in ER 182, as well as other areas. So that's the only evidence of what was heard, which is corroborated. But what would the Court find? Why would the Court find that the statement was, stay where you are? That's exactly why I suggested to the Court that there's clear error. He ignored the fact that this young individual was corroborated by other police officers. There was a police officer who was controlling the streets who stated he said to Mr. Mitchell, stay where you are or get down. He was confused. I don't know, get down, stay where you are, or something to that effect. He had two different versions of what he said. But couldn't the Court decide the credibility because the young man said he was really confident in his memory, didn't he? Certainly the Court could if it was just between that young man and the police officer on the street. But we can't forget that Detective Shansky, the man who's actually doing the knock-and-announce, testified repeatedly that he heard, please get down on the ground. It was corroborated by the police, what young Mr. Mitchell said. It's not just a young individual who is nervous. This is a police officer who's doing the knocking and the announcing, saying that's what I heard. At the time in between my first knock-and-announce or simultaneous or therein or between or during the second knock-and-announce. That's what he said. In regards to the constructive amendment, I attempted to look up in the record for Judge Marshall the pages in which that occurred. In particular, the, I seem to have lost my place, which is never good. Here we go. In relation, I would point out to the Court another chart that was provided by the government. That is SCR Volume 1, page 5, which shows another chart which depicts multiple conspiracies. There was a motion before the Court again on a duplicity argument regarding multiple conspiracies. That's at page 17 of the supplemental Volume 1. And then as well as the fact that when we are arguing for the multiple conspiracy instruction, the issue was again brought before the Court. So there's no doubt that the Court had before it the concern of multiple conspiracies, and it was that issue. Lastly. There are two separate issues going on here, though. One is the conceptual one as to what it is the defendants charged with. What's the indictment say? Are you going to have a – and the argument is put in the appellate brief. Has there been an effective amendment of the indictment? The other is the severance. Are these defendants being tried together, and what's the prejudice resulting from that? Now, I understand on some level you're arguing the prejudice from people being tried together is what's fleshing out the reason to be concerned about the indictment charging a single conspiracy. But the issue that's before us on appeal remains the single versus multiple conspiracy. That's exactly right, Your Honor. The response regarding this whole issue came in regards to the question of prejudice and how did the prejudice occur. I have – now my time is counting up, which I do believe that I can't talk. We'll give you a minute to wrap up. Thank you, Your Honor. You know, there's six issues before the Court, but the main issues that the Court appears to be interested in at this point are the constructive amendment issue as well as the knock-and-announce or at least high product before the Court. There's other issues, including sentencing, that I think the courts have been dealing with since post-Booker that I believe makes this case actually go back before the Court for reconsideration on the sentencing. In regards to the constructive amendment, it's clear by the evidence presented that multiple conspiracies were alleged at trial, separate organizations, and by the jury's own determination that's apparent. In regards to the knock-and-announce, they created the exigency. They silenced the individuals. They didn't allow – they did not allow them to answer the door, and that violates the knock-and-announce rule. I appreciate the Court's time in allowing me to appear before you today. Thank you very much. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the Court. That was the final case on calendar for argument today, and this Court is in recess until 9 o'clock a.m. tomorrow morning. Thank you.
judges: Rawlinson, Clifton, Marshall